137 F.2d 669 (1943)
SPAETH
v.
BROWN, Price Adm'r.
No. 20.
United States Emergency Court of Appeals.
Heard June 9, 1943.
Decided August 4, 1943.
Einar G. Carlson, of Cleveland, Ohio (Miller B. Pennell, of Cleveland, Ohio, on the brief), for complainant.
Sol. M. Linowitz, Atty., of Rochester, N. Y. (George J. Burke, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Harry H. Schneider and Mavis M. Clark, Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
MARIS, Chief Judge.
The Complainant, an owner of housing accommodations in Cleveland, Ohio, attacks the maximum rent date  July 1, 1941  fixed by the Price Administrator for the Cleveland Defense-Rental Area in Maximum Rent Regulation No. 16 issued May 27, 1942, to take effect June 1, 1942.[1] His complaint is not against the imposition of rent regulation in the area nor against the rent date method of such regulation. He concedes that some form of rent control in the area became advisable in the year 1942 but in his protest which the Administrator denied and in his present complaint he strongly urges that the action of the Administrator in fixing as early a maximum rent date as July 1, 1941, was arbitrary and capricious. In addition he urges that the Administrator failed to give proper consideration to the directives contained in the act.
We shall first consider whether the transcript of the protest proceedings before the Administrator furnishes support for his selection of July 1, 1941, as the maximum rent date. If it does, his selection of that date cannot be held to be either arbitrary or capricious. In his opinion denying the Complainant's protest the Administrator described at length the Cleveland Defense-Rental Area and the economic conditions existing there prior to the inception of the war manufacturing program. We need not *670 repeat what was there said except to point out that Cleveland is a great manufacturing center, with iron and steel and their products, including machinery, accounting for one-half of its production. The evidence in the transcript shows that the outbreak of the war in 1939 had an immediate effect in Cleveland. Primary war supply and facility contracts awarded from June 1940 to June 1941 in the Cleveland area totaled more than $300,000,000. Subcontracts and British contracts were estimated to exceed that amount. More than $1,000,000,000 in primary war supply and facility contracts and a vast number of subcontracts were awarded in the area between July 1, 1941 and July 1, 1942.
This enormous volume of war production had its effect upon employment. In the year preceding July 1, 1941, the index of employment in the area rose 27% while pay-rolls increased 65%. The result was an unprecedented demand for housing accommodations by those who had previously been forced to double up as well as by an increasingly large group of newly married couples. Housing vacancy rates dropped from 2.9% in April 1940 to 1.9% a year later. The habitable vacancy rate then was only 1.1%. By January 1942 these rates had dropped to 1% and 0.5% respectively. From July 1935 to June 1939 the index of rents for homes in the area had risen over 17%. Between September 1939 and September 1940 this index remained practically stable and thereafter it rose only about 2% to June 1941. Even during the period from September 1939 to June 1941, however, 29 out of every 100 rental dwellings for white tenants had an increase in rent, of which 6 represented increases of from 10% to 15%, 3 increases of from 15% to 25% and 2 increases of 25% or more. Likewise during the same period 37 out of every 100 rented dwellings for non-white tenants had rent increases, of which 11 represented increases of from 10% to 15%, 8 increases of from 15% to 25% and 5 increases of 25% or more. It thus appears that while the rent level was continuing on the average to remain stable prior to July 1, 1941, significant individual increases were even then taking place.
The record after July 1, 1941, is even more significant. In eleven months following that date the rent index rose from 101.9 to 108.9, an increase of 6.9%.[2] During that period 54 out of every 100 dwelling units rented to white tenants had rent increases. Fifteen of these were increases of from 10% to 15%, 12 increases of from 15% to 25%, and 2 increases of 25% or more. Likewise 47 out of every 100 nonwhite tenants had rent increases during this period, 17 of them having increases of from 10% to 15%, 10 of them increases of from 15% to 25%, and 11 of them increases of 25% or more.
The foregoing facts all appear in the transcript which also contains much additional relevant evidence which we need not detail here. All of it furnishes sufficient support for the judgment of the Administrator that after July 1, 1941, rent increases were taking place in the Cleveland Defense-Rental Area which were inconsistent with the purpose of the Emergency Price Control Act to prevent speculative, unwarranted and abnormal increases in rents. It follows that the action of the Administrator in freezing rents in that area at their July 1, 1941 level was neither arbitrary nor capricious.
The Complainant urges that the increase in rents which took place during the year following July 1, 1941, was too slight to be called speculative, unwarranted or abnormal. But without stopping to point out the fallacy of relying wholly upon average figures and without conceding that rent increases of 10%, 15% and 25% may be regarded as slight, we point out that even slight increases in rents must be controlled if the inflationary tendencies resulting from defense activities are to be checked as the act contemplates. See Lincoln Sav. Bank v. Brown, Em.App., May 7, 1943, 137 F.2d 228. But, says the Complainant, these increased rentals are still relatively lower than those which prevailed in Cleveland between 1919 and 1931 and which now prevail in some other communities. This may be conceded, but the answer is that it is wholly immaterial. Congress clearly authorized the Administrator to stabilize rents at the level at which they stood in the particular area in question on the most recent date which did not reflect increases resulting from defense activities. It did not intend that all rent control should be suspended until rentals reached the higher levels of an earlier generation.
*671 The Complainant contends that the use of July 1, 1941 as a maximum rent date is unfair because prices and wages were not also frozen at that time but were permitted to increase to a substantially greater extent than rents before they were later brought under legal control. Consequently, he says, those Cleveland landlords who are dependent on rents for their livelihood have found the purchasing power of their rental dollars so reduced by reason of the Administrator's rent freezing regulation that their living standards have been impaired contrary to the policy of the act. He argues that the Administrator "should be required to fix a maximum rent date not earlier than the freezing date of other living costs or other sources of income." It may be conceded that average rents in Cleveland did not between 1939 and March 1942[3] increase proportionately to wages and the prices of foods and other commodities. There are two reasons, however, why the conclusion which the Complainant seeks to have us draw from these facts is inadmissible.
The first reason is that changes in the rates of gross rental received by a landlord have no direct relationship to changes in his net income. Thus increased rental may be wholly absorbed by increased expense. On the other hand increased occupancy or economies in operation may produce an increase in the owner's net income without any increase in the rental rate.[4] Likewise a small increase in gross rental will if expense remains the same produce a much greater rate of increase in the landlord's net income from the property.
In the second place the act contemplates that rent regulations shall be generally fair and equitable; it does not require that they assure a fair return to each individual landlord, Wilson v. Brown, Em.App., July 15, 1943, 137 F.2d 348, or that they maintain his relative purchasing power. To increase rents in order to maintain a landlord's purchasing power might well result, as the Administrator suggests, in the impairment of the standard of living and purchasing power of large numbers of consumers and wage earners having an equal claim to protection.
The Complainant argues that the Administrator in framing his maximum Rent Regulation did not consider the recommendations of State and local officials in the area, as required by Sec. 2(b) of the Act.[5] He says that the Cleveland Fair Rent Committee recommended a maximum rent date of December, 1941, and that its recommendation was ignored. In answer to this contention the Administrator in his opinion denying the Complainant's protest states that "the experience and recommendations of the `Fair Rent Committee' as well as other persons were considered." This statement we accept. The act did not require the Administrator to follow such a recommendation if, as here, he believed it not to be practicable.
The Complainant also contends that in issuing his Maximum Rent Regulation the Administrator did not carry out the requirements of the act in that he failed to reflect increases in costs of maintenance and operation of rented properties in the area which had taken place since July 1, 1941, the maximum rent date. In support of this contention the Complainant refers to data showing increases in building costs in the country at large and in unskilled labor rates in Cleveland. He also points out that the ratio of expense to rental income is greater in Cleveland than in a number of other large American cities. But merely showing that certain prices and wages have increased does not establish that rents frozen as of a prior date are unfair. It is only in the light of actual rental operations that such facts become significant. Chatlos v. Brown, Em.App., May 28, 1943, 136 F.2d 490.
In the Chatlos case we pointed out that increased costs in some particulars may be offset by increased occupancy and savings resulting from economies of operation which are possible in wartime. In the absence of evidence by the Complainant to the contrary we may well infer that this is true *672 in his case. Such an inference is especially admissible in the light of the results, which have been included in the transcript, of a study by the Accounting Division of the Office of Price Administration of the operating experience of a large group of apartment houses and other rental units in the Cleveland area, together with an investigation of price, wage and tax trends in the area. From this study it appears that the net operating income of the landlords studied would be greater under rent control than it was during 1939 and 1940. Indeed the Complainant in his brief concedes the correctness of the facts shown by the Administrator's analysis.
The Complainant urges, however, that the ratio of 62.4% between expense and rental income in Cleveland, as shown by one of the Administrator's exhibits, is substandard for the country at large and that the Administrator should have taken account of this in fixing the maximum rents for the Cleveland area. The evidence, however, clearly shows that there were wide differences in the expense ratio between different American cities in the years before the war. Since these differences, which are doubtless the result of bargaining between landlords and tenants in a complex of varying tax rates and other local factors, were normal before the war, it is clear that it is no part of the duty of the Administrator to attempt to reform the economy by equalizing them now.
The Complainant also suggests that the Cleveland expense ratio is substandard according to the mortgage underwriting practices of the Federal Housing Administration. Our consideration of the practices of that agency, however, leads us to believe that it takes into consideration so many factors that one of them, the expense ratio, could hardly determine the result it reaches. Nor do we think it is established by the Complainant that the Cleveland expense ratio exceeds the standard set by the Federal Housing Administration.
We conclude that Complainant has failed to sustain his protest and that the Administrator did not err in denying it.
The complaint is dismissed.
NOTES
[1] 7 F.R. 4090. Maximum Rent Regulation No. 16 was also before us in Lakemore Co. v. Brown, Em.App., July 15, 1943, 137 F.2d 355. In that case, however, the propriety of the selection of the maximum rent date was not challenged.
[2] During this period the index of average rents for wage earners and lower-salaried workers in Cleveland rose from 102.3 to 109.9.
[3] The General Maximum Price Regulation issued April 28, 1942, 7 F.R. 3153, froze commodity prices at their March 1942 levels.
[4] Compare Chatlos v. Brown, Em.App., May 28, 1943, 136 F.2d 490.
[5] 50 U.S.C.A. Appendix, § 902(b): "In * * * prescribing regulations and orders establishing maximum rents for such accommodations * * * the Administrator shall, to such extent as he determines to be practicable, consider any recommendations which may be made by State and local officials concerned with housing or rental conditions in any defense-rental area."