140 F.2d 316 (1943)
MADISON PARK CORPORATION
v.
BOWLES, Price Adm'r, and seven other cases.
Nos. 33-40.
United States Emergency Court of Appeals.
Heard September 20, 1943.
Decided December 27, 1943.
*317 *318 *319 S. Harold Shefelman, of Seattle, Wash., and Albert Olsen, of Spokane, Wash. (W. L. Grill, of Seattle, Wash., on the brief), for complainants.
Nathaniel L. Nathanson, Asst. Gen. Counsel, and Sol M. Linowitz, Chief, Court Review, Rent Branch, both of Washington, D. C. (George J. Burke, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, and Harry H. Schneider, Charles P. Liff, and Betty L. Brown, Attys., all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
Heard at Seattle September 20, 1943.
LAWS, Judge.
In these cases, eight owners of rental properties in Seattle, Washington, complain against Maximum Rent Regulation No. 20 (redesignated Rent Regulation for Housing, 8 F. R. 7322, June 1, 1943), issued by the Price Administrator pursuant to the Emergency Price Control Act of 1942. This regulation, issued May 27, 1942, and effective on June 1, 1942, established maximum rents for housing accommodations, other than hotels and rooming houses within the Puget Sound Defense-Rental Area at the rentals in effect on April 1, 1941. The area covered by the Regulation consists of the County of Kitsap and parts of the Counties of King and Pierce. Within this area are three principal cities: Seattle, Tacoma and Bremerton. No complaint is made against the Regulation as it applies to property owners in Kitsap and Pierce Counties, the challenge of the Regulation being made only as it affects property owners in King County, where Seattle is located.
With one exception, complainants are owners of apartment houses. The exception is an owner of lots which are rented to tenants who place temporary dwellings on them for occupancy during the terms of their leases. All complainants make substantially the same objections to the validity of the Regulation; there contend that if the Regulation is in conformity with the Act, the Act itself is unconstitutional.
Complainants contend that in establishing April 1, 1941, as the maximum rent date, the Administrator rolled back rents in Seattle to a point where landlords did not have the benefit of normal increases of rents which occurred after defense activities began in the Area, and that this was in violation of the Act which authorizes the Administrator to prevent only excessive increases. The Administrator, on the other hand, contends that the increases that took place where not normal and maintains, in addition, that the Act may not be construed as limiting him to the prevention only of excessive increases in rents, but if he finds inflationary tendencies exist in an area, he has the right to establish a maximum rent date which in his judgment will bring about stabilization, regardless of whether such maximum rent date allows for any increases in rents after defense activities commenced.
In Section 1(a) of the Price Control Act. 50 U.S.C.A.Appendix § 901(a), we find the language principally relied upon by complainants. It reads as follows: "* * * the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; * * * to prevent hardships * * * which would result from abnormal increases in prices; * * *."
This section deals exclusively with purposes of the Act, making no reference to the manner in which the Price Administrator shall bring about accomplishment of such purposes. It is in Section 2, 50 U.S. C.A.Appendix § 902, that the conditions under which the Administrator shall act are set forth. Subsection 2(a) deals with commodities and provides that "whenever in the judgment of the Price Administrator * * * the price or prices of a commodity or commodities have risen or threatened to rise to an extent or in a manner inconsistent with the purposes of the Act, he may * * * establish such maximum price or *320 * * * prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." Subsection 2(b) deals with rents. Its language is slightly different. It provides that: "Whenever in the judgment of the Administrator such action is necessary or proper in order to effectuate the purposes of this Act," he shall declare the necessity for stabilization or reduction of rents in any defense-rental area, and make recommendations with respect to their stabilization or reduction; then, if within sixty days, in his judgment they have not been stabilized or reduced as recommended, he may establish such maximum rent or rents as in his judgment will be generally fair and equitable and will effectuate the purposes of the Act. In selecting the date on which to base maximum rents, he is directed to consider the time when "defense activities shall have resulted or threatened to result in increases in rents for housing accommodations in such area inconsistent with the purposes of this Act."
It will be noted that the Administrator is limited, both with respect to fixing maximum prices of commodities and with respect to stabilizing or reducing rents, to the establishment of such prices or rents "as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." There is no express provision in this language, or in the language of Section 1(a) setting forth the purposes of the Act, which compels the Administrator to allow normal increases in prices or rents. But it is contended that since the Act expresses a purpose "to prevent speculative, unwarranted, and abnormal increases in prices and rents" and since it contains other similar language, all relating to abnormal and excessive prices, it follows by necessary implication that the Act does not authorize interference with small or normal increases.
There can be no question that the Court must be guided by the elementary rule of construction, that wherever possible, the language will be interpreted so as to give effect to the objects sought to be accomplished. The intent may be gathered from words used, but in some instances the Court must look beyond isolated words to the dominating purposes of the legislation.[1] Here the object of the legislation clearly is to combat the inflationary effects of increasing prices and rents, in the interest of sound economy throughout the nation during and after a period of war. As we previously have pointed out,[2] one of the recognized principles of economics is that in time of threatened inflation, any increase of price, *321 however small, tends to accelerate the upward surge which brings about inflation. Sound economics, it is true, also requires that industry, business and investors be given generally fair and equitable treatment, so that their enterprises will not suffer unduly and possibly be abandoned. But there is a clear distinction between dealing with investors on a fair and equitable basis, which permits reasonable profits, and dealing with them on a basis which, by permitting increases in prices and rents during a period when there are heavy demands in the market, enables them to make exorbitant profits. Increased volume of sales in commodities and increased occupancy of demised premises in many instances will permit fair and reasonable returns to business and investors without any rise in prices.[3]
Under these circumstances, should this Court imply from a stated purpose "to prevent speculative, unwarranted, and abnormal increases in prices and rents" and the use of other similar language the requirement that "normal" increases must be permitted? It seems to us obvious that we should not. The accomplishment of a declared purpose to prevent abnormal increases in prices and rents may be attained, indeed in some instances may only be attained when no increases whatever in charges are permitted after inflationary pressure is threatened in an area. The program of stabilization well might be defeated if the Administrator were required, in every instance in which he established a price or rent level, to give effect to what were claimed to be normal increases in charges. Where the language used does not clearly compel it, courts will not read into legislation mandates which may prove disastrous to the objects sought to be attained. In this instance, the language of the law not only does not compel the result contended for by complainants, but appears to compel otherwise. The statute refers not only to "abnormal" increases, but also to those which are "unwarranted". If "normal" increases in prices and rents are found to be not warranted in a community because they threaten to cause inflation, it follows in logical sequence that they must be suppressed. Indeed in an area strongly affected by abnormal defense and war activities, even very small increases in prices and rents may be described as abnormal.[4]
Our views in this connection are supported by the unlikelihood that Congress would impose upon the Price Administrator, whose duties otherwise are most difficult and complex, the intolerable, if not impossible, burden of fairly and reasonably distinguishing between what would constitute normal and what would constitute abnormal increases in prices and rents after defense activities had begun in an area. This is particularly so when in many instances the granting of so-called normal increases would not be required for the protection of investors, but would simply make possible the yielding of large increases in profits. It need not be argued that in time of war Congress expected all to share in sacrifices where necessary to maintain a sound economy and was interested only in vouchsafing to investors generally fair and equitable treatment.
For the reasons stated, we conclude that under the Emergency Price Control Act of 1942, whenever the Administrator finds it necessary to regulate rents in an area where inflation is threatened, he may do so without making allowance, on the sole ground that such increases were normal, for any increases in rents after defense activities began in the area. This brings us to a consideration of whether the Administrator acted reasonably in finding it necessary to regulate Seattle rents in order to effectuate the purposes of the Act.
This Area, a shipping and shipbuilding center of major importance, was one of the first to be affected by the outbreak of war in Europe. The dollar volume of defense construction in September, 1940, was slightly over $357,000,000. In January, 1941, it had risen above $553,000,000 and in May, 1941, it reached $671,000,000. Import and export tonnages for both Seattle and Tacoma steadily rose during 1938, 1939 and 1940. With increased defense activities in the Area came other effects on the economy. Retail sales in the three principal cities in the Area showed steady and substantial gains during 1939, 1940 and 1941. Commuter traffic between Seattle and Bremerton rose steadily after early 1940. Comparing the first eight months of 1941 *322 to the first eight months of 1940, the Seattle Chamber of Commerce disclosed substantial increases in various other activities.[5]
Population trends are important in considering the threat of inflation. Between June, 1940, and April, 1941, employment in manufacturing industries in Seattle increased 33.8%. Between November, 1940 and May, 1941, the number of workers employed in principal war production industries in the Area was more than doubled  reaching a total of 41,300 persons. In November, 1940, the President of the Seattle Chamber of Commerce stated that two all-time records in the number of ships being serviced and the number of civilian employees had been broken at the local navy yard. Among 39 cities for which migrant data was compiled by the Federal Works Agency, only three received a greater absolute number of migrants than Seattle during the first year of the defense program and in relation to its 1940 population Seattle attracted a greater number of migrants than any other city of over 300,000 population. The record discloses that population increases in the Area resulted not only from the influx of civilians but that army personnel in the Area increased 28,499 from November 1, 1940, to June 15, 1941, and navy personnel increased 8,097 from July 1, 1940, to May 1, 1941.[6]
To be compared to this population trend in the Area was the dearth of new housing facilities. Respondent shows that the unjustifiably large amount of building construction during the several years preceding 1930 was counter-balanced by the fact that during the following decade building construction was negligible. The habitable rental vacancy rate for Seattle in December, 1940, was 1.6%. By August, 1941, this rate had dropped to 1.3% and by March, 1942, to 0.4%. By November 20, 1940, the President had determined and declared that an acute shortage of housing existed or impended in each of the three major cities in the Area.
Respondent has incorporated into the record figures of the Bureau of Labor Statistics indicating the trend of rentals in the Area. They show that rentals in Seattle maintained a steady upward trend from July, 1935, to March, 1938. The total increase in average rents during this period was 14.2%. There was little variation in the rent level from March, 1938, to June, 1941, when rents again began an upward climb which did not halt until the Regulation was made effective. Between June, 1940, and March, 1941, 14% of all rental homes in Seattle had rent increases. The average rental increase was 11.4%, but 16 out of every 100 increases were from 15% to 25% above previous rentals. Twenty out of every 100 increases in rents under $30 were from 15% to 25% above previous rentals. These figures are based on rents for equivalent dwellings at the dates named.
The record discloses that defense activities in the Area increased after April 1, 1941, at a rate equal to or in excess of the rate during the period immediately preceding April 1, 1941, and rents did likewise. The amount of prime contracts in effect on the maximum rent date, somewhat in excess of $500,000,000, doubled by the end of 1941 and more than quadrupled by June, 1942. Between March, 1941, and May, 1942, rents were increased for 4 out of every 5 rental dwellings in Seattle. The average increase was 19.1%, but 14 out of every 100 increases were from 30% to 45% above previous rentals.
The evidence presented in the record by complainants substantiates the respondent's evidence dealing with increased rents. Complainants show rents for all classes *323 of property in Seattle in 1942 were 8.98% more than in 1941. Another estimate incorporated by complainants into the record places the average increase from April 1, 1941, to April 1, 1942, at 10% to 15%. The burden of complainants' evidence is not that no increases took place but that those which did take place were rises from a subnormal level and were not unusual, particularly when compared to rises that took place in other costs of living.
In light of these facts, we find it was reasonable for the Administrator to determine that on April 1, 1941, inflationary tendencies existed in the Area and that as of that date rents had risen, or threatened to rise, in a manner inconsistent with the purposes of the Act. We conclude, therefore, that, in establishing April 1, 1941, as the maximum rent date for the Puget Sound Area, the Administrator had the lawful right to prevent all increases after that date unless such increases were required to be granted by other provisions of the statute which we have yet to discuss.
The foregoing discussion with respect to rises in rents provides an answer to another argument of complainants, to the effect that the Administrator acted arbitrarily and capriciously in finding that rents had not been reduced and stabilized by State or local regulation, or otherwise, in accordance with the recommendations previously made by the Administrator. Complainants' contention that rents had been stabilized as provided by the Act is clearly untenable in view of the fact that rents in the Area are shown to have advanced continuously until June 1, 1942, the effective date of the Regulation, whereas the recommendation of the Administrator was that maximum rents should be those in effect on or about April 1, 1941. The Emergency Price Control Act does not bind the Administrator to a program of rent control which might be worked out to the satisfaction of State or local authorities. It places control in the Administrator and when in his judgment his recommendations have not been carried out, he is called upon to take the regulation from State or local supervision.
Complainants contend, for a number of different reasons which we shall presently consider, that by establishing April 1, 1941, as the maximum rent date in the Puget Sound Defense-Rental Area, the Administrator did not deal fairly and equitably with the rental industry in Seattle.
The Emergency Price Control Act authorizes the Administrator to establish maximum rents which "in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." The Act does not undertake to define the term "generally fair and equitable" or to lay down precise standards for determining what the term embraces. However, it is not without indications in these respects. In establishing a maximum rent for any defense-area housing accommodations, the Administrator is admonished that, so far as practicable, he shall give consideration to rents prevailing on or about April 1, 1941, or on a date (not earlier than April 1, 1940), which does not reflect increases inconsistent with the purposes of the Act. Adjustments are required for relevant factors found to be of general applicability in respect of such accommodations, including increases or decreases in property taxes and other costs. The Administrator is directed, to such extent as he determines practicable, to consider recommendations by State or local officials concerned with housing or rental conditions in the area.
In the legislative history of the Act[7] there is further guidance as to the meaning *324 of the words "generally fair and equitable". From discussions of the legislation before its enactment, it appears the intention was to permit business a yield or profit sufficient for its sustenance in a state of efficiency and for reasonable development and expansion. Mention also was made of providing a living for those who maintain industries. The discussions indicate it was believed these objectives usually will be attained by permitting profits which the industry was willing to accept prior to defense activities.
We do not decide that this Court should limit the application of the term "generally fair and equitable" to standards mentioned in the law and in discussions of its enactment while pending in Congress. It may be possible that a case will occur in which the effect of a regulation established by the Administrator clearly will be shown to be generally unfair and inequitable on grounds not mentioned. But in such a case the reasons must be clear and compelling. The Act provides the Administrator may establish such rents as in his judgment will be generally fair and equitable. Review in this Court is plainly limited. It may not substitute its judgment for the judgment of the Administrator, but may act in review only when it finds the regulation is not in accordance with law or is arbitrary and capricious. Thus if the Court finds any reasonable basis to support the view that the regulation deals fairly and equitably with the industry concerned, the regulation must stand.
In light of these principles, we proceed to discuss the several claims of complainants that the Regulation is generally unfair and inequitable.
Several contentions made are based upon the proposition that the maximum rent date is established during a period of rising prices when many landlords had not raised their rents. These contentions may be summarily disposed of as a challenge to the maximum rent date method of control which previously has been upheld by this Court.[8]
It is next urged that the Regulation is not generally fair and equitable because it establishes a ceiling which is below the normal level of rents in the Area. It is argued that apartment house rents in Seattle became abnormally low after a period of overbuilding between 1927 and 1930 and had not recovered to a normal point by April 1, 1941. This situation, it is said, is aggravated by the fact that tenant income has greatly increased in the Area, resulting in a disproportionately small amount of income being spent for rent. In support of this contention, complainants point out that in Seattle, as of March 15, 1941, 14.2% of the income of a four-person manual worker's family at maintenance level was spent for rent,[9] whereas it is usually accepted that between 20% and 25% of income is a reasonable expenditure for rent. Complainants further point out that, according to a Department of Labor survey of 33 cities, the ratio of tenant rental expense to tenant income in Seattle was *325 lowest, and nevertheless in cities such as San Francisco, Oakland, Portland and Vancouver, with figures approaching a 20% average, rents were frozen as of March 1, 1942, eleven months later than Seattle.
We have heretofore pointed out that the Administrator has no obligation to permit any increases in rents, after defense activities began in an area, on the sole ground that the increases are "normal". The reasons given apply with equal force to the view that the Administrator is not required to suspend rent control until rents in an area reach that which might be found to be a normal level. Furthermore, complainants have not established that the rent level at or about 1928 was normal for the Seattle Area. They make the bare assertion that this is true. Normality of rents cannot be established by merely selecting a level which is favorable to landlords and which existed prior to a depression. Assuming a normal state of rents in an area is susceptible of being reasonably established, there are many factors over a number of years which necessarily would have to be ascertained and considered. The Price Control Act imposes no such duty upon the Administrator. The concern of the Act is to provide a program of firm restraint against inflation; industry, while assured of fair and equitable treatment, is not assured of rises in prices or rents to heights of previous years.[10]
It doubtless is true that the Administrator must apply the same standards in the various defense-rental areas in determining what is generally fair and equitable. But the application of these standards will not result in selecting the same maximum rent dates or in the payment by tenants in all areas of rents which bear the same relationship to their earnings. The law plainly recognizes, as indeed complainants do in discussing another point, that the problem of rent control to a large extent is local. The impact of defense activities was felt at different times in different areas. The economic factors affecting rents vary in different areas. Landlords throughout the nation do not usually follow a method of fixing rents on the basis of a fixed percentage of their tenants' income. Ability to pay the rental charged is important, but there are other factors of equal importance. Among them are the return on investment, the location of the property, the type of property and the supply of and demand for similar accommodations. These and other considerations must be taken into account in any comparison of rents between different defense areas in the country. No evidence has been adduced by complainants with regard to these elements, and without it, comparisons of the amount and percentage of income spent for rent in various areas are without weighty significance.
There is another reason why the contention of complainants is not persuasive. Long before defense activities were commenced, there were differences between incomes and economic situations of landlords in different areas, brought about by reason of varying conditions. These differences appeared in a period of free bargaining between landlord and tenant. We cannot assume that Congress, in seeking to curb inflation during an emergency of war, had in mind imposing upon the Administrator the burden of reorganizing the affairs of landlords and tenants throughout the nation so as to bring about substantially similar yields of income. This result was not sought to be attained in peace time, and no reason appears why it should be sought as part of a rent control program in war time.
Complainants maintain that the including of Seattle, Tacoma and Bremerton within the same defense-rental area resulted in the establishment of an unfair and inequitable rent ceiling in Seattle. As previously noted, no complaint has been made with respect to the maximum rent date as it applies to Tacoma and Bremerton. Complainants contend that conditions were not the same in Tacoma and Bremerton as in Seattle; that the problems in the cities are dissimilar and require separate treatment. It is stated that the impact of defense activities was felt in Seattle about nine months later than in Tacoma and eighteen months later than in Bremerton; that the construction of cantonments at Fort Lewis near Tacoma and the expansion of the Navy Yard at Bremerton had effects in those cities entirely different from the effects in Seattle. It is under their discussion of this point that complainants refer to rent control as being a local problem.
It may be true that in some instances, where substantially different conditions exist in neighboring cities, the same maximum rent date should not control. *326 But the combination of neighboring cities under the same maximum rent date does not establish its being unfair and inequitable as to any one of them. Differences in the effects of the rent ceiling imposed might indicate not that the date is unfair to the complaining city, but that one or more of the cities should have the maximum rent date rolled back to an earlier date. Therefore, in every case where complaint is made, it is necessary to go beyond showing a combination of cities under the same maximum rent date; the complaining city must establish, by independent evidence, that its rental industry was affected unfairly and inequitably.
The record discloses sound reasons in support of the Administrator's combination of the three cities into one defense-rental area. The Administrator in establishing a maximum rent date has the duty to select the latest date in an area which does not reflect rental increases inconsistent with the purposes of the Act.[11] The logical test as to whether this standard has been adhered to is found in changes occurring after the maximum rent date but before the issuance of the Rent Regulation. An analysis of the record in these cases discloses there were a number of increases in Seattle rents before April 1, 1941, although they were not as pronounced as those in Tacoma and Bremerton. But from March 15, 1941, to May 1, 1942, 80% of Seattle's rented homes had average increases of 19.1%. From April 15, 1941, to May 1, 1942, 41% of Tacoma's rented homes had average increases of 19% and during, the same period, 34% of Bremerton's rented houses had average increases of 19.9%. It thus appears that after the maximum rent date, the rental increases in Seattle were as great as, possibly even greater than, the increases in the other two cities. Therefore upon the record before us, we are of the opinion that this Court may not disturb the maximum rent date here involved upon the claim of improper combination of areas.
Another complaint is that the Regulation prevents a large number of apartment house owners in Seattle from realizing a fair return on their investments and from operating at a reasonable profit. At the oral argument of these cases, counsel referred to the rental industry in Seattle as being "sick" and "depressed", adopting terms used by Mr. Henderson, former Price Administrator,[12] to explain the conditions under which it was intended the rate of profit in an industry might be permitted to rise. Since we are of opinion this and other points hereinafter discussed must be disposed of because of the nature of the evidence before us, it seems advisable to point out what in our judgment is the character of evidence required in order to justify interference by this Court with the Administrator's activities. This Court must presume that the Administrator fulfilled the requirements of law in ascertaining facts concerning an industry, and having ascertained them, in acting fairly and reasonably in the establishment of a regulation. To overcome these presumptions and to establish that he acted arbitrarily and capriciously, or not in accordance with law, vague generalities are not enough; the evidence must be strong and convincing.
Here the Court may not presume the Administrator found a "sick or depressed" industry in Seattle as of April 1, 1941. It must presume the contrary. And the record strongly tends to support the latter view.
The Accounting Division of the Office of Price Administration made a survey of rental housing operations in Seattle. Respondent's brief, in referring to the record, states as follows: "Operating experience data for 116 Seattle apartment houses with 3,675 dwelling units and for 204 small structures with 263 dwelling units were collected and analyzed. The operating experience of properties managed by various rental management firms was included in order to insure the representative character of the properties examined. An investigation of price, wage and tax trends affecting rental housing in Seattle was also made. On the basis of this investigation, the Administrator was able to determine the operating experience of landlords in Seattle during the years 1939, 1940, 1941, the first six months of 1941, and the first six months of 1942, and to make an estimate of rental housing operations under one year of rent control." It was learned that rising occupancy contributed to an increasingly favorable operating position for landlords in Seattle. Percentage of occupancy for apartment houses rose from 91.5% *327 in 1939 to 99.3% in the first six months of 1942. Net operating income, before interest and depreciation, for apartment houses rose steadily from 1939 until the advent of rent control. Expressed in percentages, and using the net operating income figure for 1939 as 100, the 1940 figure was 103.3; the 1941 figure was 136; and it was estimated that the figure for 1942 would be 116.6.
This favorable position of landlords in Seattle is supported by a later survey by the Price Administrator, dealing with actual operating experience under the first six months of rent control.[13]
What is the nature of the testimony upon which the Court is asked to rely to support the claim that as of April 1, 1941, the rental industry in Seattle was "sick" and "depressed" and that landlords cannot operate at a reasonable profit on rentals fixed as of that date? Reliance is placed upon financial statements of a few individual apartment houses. Obviously proof of failure of only a few to make profits will not support complainants' case. But they also rely upon a survey made of 101 apartment houses in Seattle. Although the schedules were put in final form by Certified Public Accountants, the ground work of the survey was not properly laid. There was lack of uniformity in accounting practices, individual operators reported on different bases, and therefore a clear presentation of conditions was not made. Then the important figure as to the net income derived from the apartments was based upon an assumed 5% vacancy rate, established solely by opinions of individuals. The statement of the Accountants as to this estimate appears significant: "* * * we were informed that five per cent of the gross income at one hundred per cent occupancy * * * is a normal and reasonable allowance to cover bad debts and time lost between changes of tenants." (Italics supplied.) The evidence of the Administrator shows the actual vacancy rate during the year 1942 was only 1.1%. And there is a discrepancy in complainants' stated opinions. In one brief filed, it is suggested that "* * * it would only be fair to assume, even in a time of unprecedented demand, a loss of as much as two per cent due to the time consumed in switching tenants and the incidental cleaning and redecorating * * *." (Italics supplied). The vacancy rate is of great importance in calculating the profit position of landlords, since even a small change in gross rental income may constitute a substantial change in the rate of net income. Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669, 671.
We find other figures and calculations relied upon by complainants are unsubstantial. They consist of several estimates of fair value of the 101 apartments surveyed, to which is compared an amount referred to by complainants as the total net profit of the buildings for the year 1941. One method of valuation of the properties failed to take into account the important element of depreciation and the others are at best only rough estimates. Moreover, complainants compared with the total value of the buildings a net profit figure arrived at after deduction of substantial payments of interest on mortgages. Plainly when calculating what is a fair return on the total values of properties without reference to mortgage loans, the net profit figure to be compared must include income used to pay interest on mortgage loans. Since the total *328 value figure disregards mortgages, in any fair comparison the interest payments on mortgages must be disregarded.
The claim of complainants that the income on rental properties in Seattle under rent control is not sufficient to enable landlords to make principal payments on mortgages also is subject to challenge because the evidence insufficiently establishes the facts. But if the facts are conceded, the point is without merit. The Price Control Act, while assuring generally fair and equitable treatment of landlords, does not require that they shall be assured of profits so large as to enable them to accomplish either part or full payment of the purchase price of their properties. Such requirement would cause the Administrator to make comprehensive investigations as to the extent and character of mortgage loans in an area and possibly to subordinate a sound program of stabilization in order to rescue improvident investments.
For the reasons stated, we are of opinion the evidence adduced by complainants does not establish that as of April 1, 1941, the rental industry in Seattle was "sick or depressed" or that apartment house owners are being prevented, by the ceiling imposed, from realizing fair returns upon their investments.
Although argued separately, there is closely allied to the point under discussion the contention that the returns allowed to landlords in Seattle under the ceiling imposed are not sufficient to permit the building up of reserves necessary for deferred maintenance charges and for vacancies that may be expected after the war, and that in this manner the Regulation does not provide protection against a post emergency collapse of values. In answer to a similar contention made in a case previously decided by this Court, we stated as follows: "But complainant is not entitled to `make a killing' in war time in order to compensate for losses in earlier years and anticipated losses in the future. If complainant's proposition were accepted, it would be equally applicable to persons subjected to price control in the sale of goods and services and would obviously jeopardize the entire stabilization program."[14]
There doubtless is a distinction between a class of cases where complainants seek to obtain large returns, or as stated above, "make a killing", and a class where complainants seek returns customarily recognized as necessary to provide reasonable sustenance and development of the industry and a living for investors. But there is no evidence adduced by complainants which brings landlords in Seattle within the latter class. Not only is there no satisfactory showing, as previously pointed out, that reasonable profits are not generally accruing to Seattle landlords, but there is no showing whatever as to the extent to which maintenance charges are being deferred. Without convincing evidence upon these points the Court is not in a position to determine whether the maximum rent ceiling is destined to cause a post emergency collapse of values in Seattle.
The next attack made by complainants against the Regulation is that in its establishment the Administrator failed to make adjustments for increased taxes, wages and other operating costs between April 1, 1941 and June 1, 1942, the effective date of the Regulation. The Administrator concedes that costs generally increased in the Area. He contends, however, that complainants have failed to introduce evidence showing the extent of the increases affecting landlords in the Area or showing that upon consideration of all relevant factors landlords are not receiving generally fair and equitable treatment.
The pertinent provisions of the Act, in Section 2(b), read as follows: "So far as practicable, in establishing any maximum rent for any defense-area housing accommodations, the Administrator shall ascertain and give due consideration to the rents prevailing for such accommodations, or comparable accommodations, on or about April 1, 1941 * * *, and he shall make adjustments for such relevant factors as he may determine and deem to be of general applicability in respect of such accommodations, including increases or decreases in property taxes and other costs." This language provides not that increased costs alone shall require adjustments but that they are to be considered, in deciding whether adjustments should be made, along with other relevant factors.[15] Profits in the industry are quite as relevant to the establishment of fair rents as are general increases in costs of operation.
*329 We have heretofore pointed out that it is our opinion that complainants' evidence is insufficient to prove a generally unfair state of profits in the Seattle rental industry. So far as the record shows, Seattle landlords, because of increased occupancy of their demised properties and for other reasons, are enjoying net profits as satisfactory as those they enjoyed before the advent of defense activities.
In Chatlos v. Brown, Em.App., May 28, 1943, 136 F.2d 490, 494, we stated the rule to be that a regulation will not be declared invalid on the ground of the Administrator's failure to grant upward adjustment for increased costs, unless the record before the Court establishes that the failure to make such adjustment rendered the maximum rents fixed by the Regulation generally unfair and inequitable.
Accordingly, complainants' attack based upon failure of the Administrator to make adjustments for increased costs must fail.
Complainants contend that if the Regulation is held to conform to the statute, the statute and the Regulation are unconstitutional, inasmuch as they make no provision for judicial determination of whether the rent fixed by the Administrator is compensatory to individual owners, and, therefore, they are confiscatory and a deprivation of property without due process of law. This contention was disposed of by this Court in its opinion in the case of Wilson v. Brown,[16] where it was held that a rent regulation is not defective on the ground that it deprives an individual owner of a fair return on the market value of his property.
Complainants also challenge the constitutionality of the Regulation on the ground that it does not permit persons who purchased Seattle rental property subsequent to the maximum rent date to charge sufficient rents to enable them to meet the terms of contracts entered into in the light of the then existing rentals. It is well established that a legislative mandate intended for the welfare of the public may validly interfere with private contracts,[17] and we perceive no distinction in this connection between the rights of landlords who purchased property before and those who purchased property after the maximum rent date. However, in this case there is no need to decide this point, since there is no showing that any of complainants is affected by the Regulation in the manner of which they complain. Nor does the record set forth other essential facts. There is no specification of parties who actually made contracts after April 1, 1941, or of the terms of the contracts. There is no showing of facts upon which the Court may base a conclusion that cancellation is really threatened, or may determine the cause of such threat. The record does not show that any contracts made in Seattle after April 1, 1941, actually have been cancelled because of the Regulation. In this hypothetical and uncertain state of the record, this Court should not undertake to pass upon serious questions as to the constitutionality of regulations. Its judgment under such circumstances would necessarily be inconclusive and misleading.
Complainants challenge the provisions of the Regulation which restrict the eviction of tenants. They contend that these provisions are unconstitutional and are beyond the scope of the Administrator's authority.
The validity of these provisions was upheld by us in the case of Taylor v. Brown.[18] Moreover, as pointed out by respondent, legislation accomplishing a similar purpose after the last war was upheld by the Supreme Court.[19]
The essential problem is whether or not the restrictions are reasonably necessary to accomplish the rent control objectives of the Act. The Administrator's justification for these restrictions is expressed by him as follows:
"Tenant security is one of the principal problems encountered in the administration of rent control. Experience has shown that in an area where there is a housing *330 shortage the average tenant is more concerned about a roof over his head than about the maximum rent. If the landlord were free to evict, the tenant would probably agree to pay an illegal rent and would not complain to those charged with the administration of rent control. In order to make rent control effective it is necessary to remove the fear of unwarranted eviction. The regulations therefore limit the grounds on which the landlord may proceed to secure the removal of a tenant in occupancy. * * *"[20]
In his opinion accompanying the order denying complainants' protests, the Administrator pointed out that:
"Tenants would be inclined to meet unlawful demands rather than to face the task of finding new living quarters in a congested area. Furthermore, the war effort would be hampered to the extent that the efficiency of tenants who are war workers would be impaired by difficulties attendant upon finding and moving to new living accommodations."
Complainants have offered nothing in dispute of the reasoning of the Administrator except a denial of its correctness. We hold these provisions regarding the eviction of tenants to be constitutionally valid and a reasonable exercise of the Administrator's discretion.
Complainants likewise attack what we assume to be subsection 6(b) (2) of the Regulation restricting the eviction of tenants in connection with the sale of property. Eviction in such cases may be authorized by the purchaser's making principal payments aggregating 20% of the contract price (this was changed from 33 1/3% by Amendment No. 7, dated September 15, 1943) and a delay of three months after the issuance by the Administrator of a certificate of eviction. Exceptions are recognized under certain circumstances. However, the amendment originally restraining evictions upon sales of demised premises was not issued until October 19, 1942. The complainants failed to amend their protests to include an objection to these provisions. Since the validity of the subsection was never questioned before the Administrator, its validity may not be raised in the present proceeding. Sec 204(a) Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 924(a).
It is argued by complainants that the Act does not authorize the Administrator to establish maximum rents for unimproved lots. The bases for this contention are that the term "housing accommodations" as defined in the Act does not include vacant lots, and that regulation of the rents charged for vacant lots is unnecessary in the accomplishment of the purposes of the Act. This argument, although advanced by all the complainants, apparently applies particularly to complainant, West Seattle Land and Improvement Co. which is the owner of a number of lots which it leases to various tenants for the purpose of locating temporary dwelling houses thereon. Respondent concedes the Regulation does not apply to vacant lots, but contends that the Regulation becomes applicable after a dwelling is placed upon the land.[21]
There seems to be no question of the reasonableness of the Administrator's interpretation of the Act. The pertinent definition reads as follows:
"Sec. 302. * * *
"(f) The term `housing accommodations' means any building, structure, or part thereof, or land appurtenant thereto, or any other real or personal property rented or offered for rent for living or dwelling purposes (including houses, apartments, hotels, rooming or boarding house accommodations, and other properties used for living or dwelling purposes) together with all privileges, services, furnishings, furniture and facilities connected with the use or occupancy of such property." 50 U.S. C.A.Appendix § 942(f). (Italics supplied.)
It is well known that temporary defense housing and trailers have been pressed into use in many areas in which defense activities have created a housing shortage,[22] so that regulation of the rentals for the land *331 on which such accommodations are situated is a very important element in effective rent control.
We have considered other objections to the Regulations suggested by complainants and found them to be without merit.
The complaints are dismissed.
NOTES
[1] Reed, J., in United States et al. v. American Trucking Associations, Inc., et al., 1940, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345: "In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute. * * *

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one `plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. * * * Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, `excepting as a different purpose is plainly shown.'"
Also Jackson, J., in Securities and Exchange Commission v. C. M. Joiner Leasing Corp. and C. M. Joiner, 64 S.Ct. 120, 123, decided November 22, 1943: "* * * courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy."
[2] United States Gypsum Co. v. Brown, Em.App., August 5, 1943, 137 F.2d 360; Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669; Lincoln Savings Bank of Brooklyn v. Brown, Em.App., May 7, 1943, 137 F.2d 228.
[3] Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669, 671; Chatlos v. Brown, Em.App., May 28, 1943, 136 F. 2d 490, 494.
[4] Philadelphia Coke Co. et al. v. Bowles, Em.App., December 15, 1943, 139 F.2d 349.
[5] Air passengers increased 38.8%; bank clearings, 33%; building permits (residences), 56.4%; building permits (other), 11.3%; carloadings, 16.5%; electric power consumption, 14.9%; lumber shipments, 22.3%; new car registrations, 75.2%; postal receipts, 12.1%; real estate transfers, 31.2%.
[6] "The long-term trend of employment and pay rolls in manufacturing and non-manufacturing industries of the Seattle Metropolitan Area has been generally upward since 1933. The 1940 level was well above the previous year and substantially above the previous 1937 post-depression peak. During the first 6 months of 1941 the location of some 400 new commercial and industrial firms in the area has added momentum to the upward trend of employment and pay rolls. New high levels of activity (allowing for seasonal variation) have been recorded in each succeeding month since the spring of 1940, making Seattle one of the major areas of expanding employment in the country." Seattle, Wash., Current Housing Situation, as of August, 1941, Federal Housing Administration, Division of Research and Statistics, p. 5.
[7] House Hearings on H. R. 5479 (superseded by H. R. 5990), 77th Cong. 1st Sess. (1941), p. 394: "Mr. Henderson: I said at the opening hearing that I thought the words which Woodrow Wilson had used on the matter of a fair price were words that I wish I could have selected, and I would like to go to what he said, because that has been a guide to me, certainly on this matter of profits. I think one of the guides to price and to profit is the rate of profit which has been obtaining in an industry for some time. I think that is one of the things to rely on.

"`By a just price I mean a price which will sustain the industries concerned in a high state of efficiency, provide a living for those who conduct them, enable them to pay good wages, and make possible the expansion of their enterprises which will from time to time become necessary as the stupendous undertakings of this great war develop. We could not wisely or reasonably do less than pay such prices. They are necessary for the maintenance and development of industry; and the maintenance and development of industry are necessary for the great task we have in hand.'
"Now, taken together with the rate of profit which has been obtaining, and noting whether or not that rate of profit has in normal times been sufficient to accomplish the objectives Woodrow Wilson had in mind, I think you get a general standard on which you can go."
Id. p. 462: "Mr. Henderson: * * * Now, in the absence of interference by a monopoly, or except in the case of a sick or depressed industry, or one of the natural-resource industries, it is the assumption in the American competitive system that the price fixed in the market is a fair price; that it is intended to serve all these functions that Wilson outlined as a just price. Under the American competitive system, the rate of return varies not only within an industry at the competitive price, but very widely as between industries; * * *.
"Now, as a general guide in an industry, having in mind the savings I have outlined, it seems to me that the Price Administrator has a right to rely, in the absence of special circumstances, on what had been the rate of profit and the price, which producers, entrepreneurs, and others had been willing to accept as the return for their supplying these goods."
[8] Northwood Apartments, Inc., v. Brown, Em.App., August 27, 1943, 137 F. 2d 809; Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669; Lakemore Company v. Brown, Em.App., July 15, 1943, 137 F.2d 355; Taylor v. Brown, Em.App., July 15, 1943, 137 F.2d 654, certiorari denied 64 S.Ct. 194, November 15, 1943; Chatlos v. Brown, Em.App., May 28, 1943, 136 F.2d 490.
[9] This figure is derived from a chart prepared by the Department of Labor and published in the Monthly Labor Review, May 1941. Other estimates by complainants of the percentage of tenant income spent for rent in Seattle vary. There is a general statement that the 14.2% figure has dropped since March 15, 1941, in view of increased earnings.
[10] See Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669, 670.
[11] See Chatlos v. Brown, Em.App., May 28, 1943, 136 F.2d 490, 494.
[12] House Hearings on H. R. 5479 (superseded by H. R. 5990) cited supra note 7.
[13] The survey, which covered 3,402 apartment house dwelling units, dealt with operations for the years 1939 to 1942, inclusive. To complete the picture estimates were made to cover experience in 1943. The figures disclose that net operating income for Seattle apartment house owners was 58.7% greater in 1942, including 7 months of rent control, than it was in 1939. It was 23% greater than in 1941. Net operating income during the second half of 1942, under rent control, was slightly higher than during the first six months of 1942. The estimate for 1943 was made on the basis of no further increases in rental income and the same increases in expenses that took place between 1941 and 1942. In estimating those expenses which decreased between 1941 and 1942, no further decreases were estimated. No allowance was made for a possible lower vacancy rate in 1943 than in 1942. The estimate resulting from this analysis was that apartment house owners in Seattle, during the year 1943, would have a net operating income level which would on the average be $29.00 per dwelling unit below that for 1942, but would be $3.00 per dwelling unit above that for 1941 and $47.00 per dwelling unit above that for 1940. Income and Expense Under Rent Control, Seattle Rental Housing, Office of Price Administration, Rent Department, Program and Analysis Branch, July 27, 1943.
[14] Chatlos v. Brown, Em.App., May 28, 1943, 136 F.2d 490, 495.
[15] Cf. Philadelphia Coke Co. et al. v. Bowles, Em.App., December 15, 1943, 139 F.2d 349.
[16] July 15, 1943, 137 F.2d 348.
[17] See Taylor v. Brown, Em.App., July 15, 1943, 137 F.2d 654, 659, certiorari denied 64 S.Ct. 194, November 15, 1943, and cases there cited.
[18] July 15, 1943, 137 F.2d 654, 662, certiorari denied 64 S.Ct. 194, November 15, 1943.
[19] See Edgar A. Levy Leasing Co. v. Seigel and 810 West End Avenue, Inc. v. Stern, 1922, 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (New York Statute); Brown Holding Co. v. Feldman, 1921, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877 (New York Statute); Block v. Hirsh, 1921, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165 (Act of Congress relating to District of Columbia rental property).
[20] Fourth Quarterly Report for the Period Ended January 31, 1943, Office of Price Administration, p. 62.
[21] Interpretation I(a)-III, October 2, 1942, Pike & Fischer OPA Service 200:854.
[22] "The Puget Sound Navy Yard, located in Bremerton, has trebled its employment since the fall of 1939. A September 1940 report by the Federal Housing Administration recorded only 16 vacancies in the city. To remedy the shortage, defense housing projects are being rushed to completion and trailers have been allocated for temporary use. * * *" Memorandum, Control of Rents, House Hearings on H. R. 5479 (superseded by H. R. 5990), p. 264.