## E. & L. TRANSPORT CO. v. BOWLES, Price Administrator.

### No. 221.

United States Emergency Court of Appeals.
Heard at Washington Sept. 7, 1945.

Decided Oct. 2, 1945.

George S. Dixon, of Detroit, Mich., for complainant.

Josephine H. Klein, of Washington, D. C. (Henry M. Hart, Jr., Acting Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Jacob D. Hyman, Asst. Gen. Counsel, and T. Mildred Kushner, Atty., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and LINDLEY and LAWS, Judges.

LINDLEY, Judge.

Complainant, a contract carrier for hire by motor truck, attacks the validity of two orders of the Office of Price Administration, one entered January 18, 1945, refusing to sustain complainant's protest to order No. 40 which denied in part its application for adjustment, and the other, entered March 10, 1945, denying the protest after reconsideration. Complainant contends that it made out a meritorious case for protest under each of revised supplemental regulations Nos. 9 and 15, justifying its increase in rates which, by its petition for adjustment, it had asked the Office of Price Administration to approve; that the Administrator arbitrarily and capriciously approved only a part of the increase sought and limited the period during which the rates were to be effective. It urges also that the Administrator arbitrarily based his conclusion upon consideration of one factor alone, namely, revenue return; that his analysis of carrier income was based upon improper comparison of unlike transportation services; that he unreasonably disregarded the business practices of the carrier industry in rate-making and arbitrarily failed to give consideration to the action of the Army Air Corps assenting to the increased rates or to the approval of the same by the Interstate Commerce Commission, said to be implied as a result of complainant having filed with that body its schedule of the increased rates as its reasonable minimum rates.

Prior to the war, complainant was transporting automobiles by motor truck as a common carrier for hire under authority of the Interstate Commerce Commission. Following declaration of war, the Ford Motor Company, having contracted with the Government to produce heavy bomber planes, entered into a contract with complainant whereby the latter agreed to transport such planes and parts thereof from Michigan to Oklahoma, Texas and, later, to California, the Army Air Corps having determined that the most satisfactory means for such transportation was motor trucks. The contract necessitated the use of special vehicle equipment which the Government purchased at a cost of $1,300,000 and supplied to the Ford Motor Company, who in turn subleased it to com-

plainant for the nominal rental of $1 per year. Schedule of the original contract rates was filed with the Interstate Commerce Commission on March 21, 1942 in accord with the Act of Congress requiring contract carriers to file their reasonable minimum rates with the Commission.

In performing its contract complainant incurred certain nonrecurring charges and the details of transportation were altered somewhat, so that for a great part of 1942 complainant showed a loss in its carrier income. It thereupon negotiated with Ford and the Air Corps for increased rates for the services being performed and on September 29, 1943, under a supplemental contract with Ford, such an increase was agreed upon and approved by the Army Air Corps. The new rates were filed with the Interstate Commerce Commission. On October 2, 1943, complainant applied for adjustment of its transportation charges by the Office of Price Administration to agree with the increased rates assented to by Ford and the Air Corps and filed with the Commission. In February, 1944, the Administrator issued order No. 40 under revised supplementary regulations covering adjustment of maximum prices of commodities or services under Government contract or subcontracts. He made a finding that in lieu of the increase sought, a 7 per cent increase would be sufficient to remove any threat of hardship upon the part of complainant or impediment to the continued supply of the service to the Government. He permitted complainant so to adjust its rates as to reflect an increase of 7 per cent in overall carrier revenue until May 31, 1944, and directed it to file its schedule of rates reflecting such increase within 30 days.

On March 23, 1944 complainant filed a protest against this order alleging that the limitation of effective period of the increased rates to May 31, 1944, was invalid; that to require that conforming schedules be filed within 30 days was unreasonable and that it should be permitted to put in force the increased rates to which Ford and the Air Corps had assented. On January 18, 1945 the Administrator denied the protest. On March 10, 1945, complainant filed a petition for reconsideration and, on April 11, 1945, the Administrator denied the protest after reconsideration. Thereupon complainant came to this court.

There is little if any controversy between the parties as to the complainant's right to apply for adjustment under either revised supplementary regulation No. 9 or supplementary regulation No. 15. The first of these was designed to obviate delays in Government procurement of commodities essential to the war program. It permitted sellers who considered established maximum prices unreasonably low to apply for adjustment upward of the maximum price of commodities or services to be sold to the Government. Armour & Co. of Delaware v. Brown, Price Administrator, Em. App., 137 F.2d 233. It is essential under this regulation that the Administrator find that the prices complained of "impede or threaten to impede" the continued supply of a service subject to Government subcontract. Under supplementary regulation No. 15, the Administrator may adjust existing maximum prices for any carrier other than a common carrier upon a showing that such maximum prices subject such carrier to substantial hardship and that the adjustment requested is necessary in order to permit the continued supply of an essential service for which there is no adequate service available at a price lower than the maximum prices requested. Apparently the Administrator considered complainant's application for price adjustment under each of these supplemental regulations and made an affirmative determination that complainant had made out no case for relief beyond that actually allowed.

In his original opinion the Administrator took as the base period, as he commonly does in transportation cases, the years from 1939 to 1941, a time which it seems is quite generally more favorable for that industry than the years from 1935 to 1939, which, in many other industries, are found to be fairly representative prewar years. The evidence discloses that complainant's average annual net profits during this base period were approximately $41,000. When the Administrator increased the rates so as to reflect an increase of 7 per cent in carrier income, he found that under the prices approved by him, the annual net prewar profit would have been $47,250. The financial data submitted by the complainant showed on the same basis a net profit before income tax of approximately $45,000 for nine months ending September 30, 1943. Consequently the Administrator concluded that complainant had not made out a case justifying any relief under supplementary order No. 9 and that, under supplementary order No. 15, a 7 per cent in-

crease would be sufficient to satisfy the standards there established.

In this connection the financial data submitted by complainant, after excluding amortization of cost chargeable to loans to the Dearborn Twin Engine Company but including the 7 per cent increase, reflect the following figures: Profit before income taxes in the base period $40,786, being 6.1 of gross operating revenue, and in the current period, $146,285, constituting 7.9 of the gross operating revenue; computing at the rates asked for by complainant but including otherwise the same factors, the profit during the current period would have been $335,661 constituting 16.3 of the gross operating revenue. The figures disclose also that while complainant's capital figure remained constant at all times between 1936 and 1942, its earned surplus in 1936 was $47,805; in 1937, $45,485; 1938, $5,675; 1939, $28,784; 1940, $84,887; 1941, $110,731; 1942, $142,170; 1943, $163,899. The Administrator concluded from all these considerations and other evidence that there was no showing of threat to complainant's continued supply of services and nothing to indicate that complainant was entitled to relief, over and above the allowed increase of 7 per cent.

■ Complainant emphasizes the fact that it incurred an operating loss in the second and third quarters of 1942. During this time it experienced certain nonrecurring expenses in getting ready for and carrying out the new operation. The last quarter of 1942, when the nonrecurring expenses had ceased, seems to have been reasonably profitable. Obviously the decisive question is not whether complainant has ever had a loss but rather whether there is any present threat to complainant's continued operation. In view of the showing made as to earnings, the Administrator rightfully found that there was no such threat when the permitted adjustment was considered.

■ Complainant urges that the Administrator, in considering its prewar income and its current operations, should have made comparison between the two on the basis of profit sales ratio rather than upon that of dollar volume of profits. This amounts to assertion that increased volume of business must always result in a proportionate increase in net profits. In his first opinion the Administrator remarked that complainant's prewar profit sales ratio, when applied to its current sales, would practically triple its prewar earnings; and this court has previously announced that increased volume of sales of commodities in many instances will in itself bring about fair and reasonable returns to business and investors without rise in prices. Madison Park Corporation et al. v. Bowles, Em. App., 140 F.2d 316. Furthermore the data furnished by complainant shows, when 7 per cent is added, a substantial increase in the ratio of profits to sales. Not only has volume increased but likewise the percentage of profit upon sales.

■ It is to be observed that in calculation of complainant's operating profits, the Administrator excluded a charge for amortization growing out of loans to the Dearborn Twin Engine Company of $250,000 through December 31, 1943 and an additional sum of $60,614 through March 31, 1944. These sums were loans of capital funds of complainant to the company which produced the equipment with which the transportation was made. But Ford had undertaken and was contractually bound to procure this equipment and the Army Air Corps to reimburse Ford in the sum of $1,230,336. The Government has since fully reimbursed Ford. Consequently the action of complainant in loaning funds to the manufacturer which produced the vehicles was entirely voluntary upon its part, necessitated in no wise by its contractual undertakings with Ford or the Army. These loans were no part of the transportation cost; therefore, the Administrator rightfully excluded them in the computation of transportation income.

■ Complainant also insists that its present operations require a working capital over and above that needed for prewar operations and that it has been compelled to sell a large part of its equipment to provide this. We have already observed that over $300,000 was loaned voluntarily, not under compulsion of any contract, to the manufacturer of the equipment. Thereby this money was removed from the working capital. Despite this, the balance sheets, as we have seen, show a steadily increasing surplus.

Consequently it seems far from apparent that complainant was compelled to dispose of equipment in order to obtain working capital or that it could not have stored the equipment until after the war. Indeed,

complainant's books reflect a substantial profit arising from the sale of equipment. There is no showing that complainant's return is not sufficient to provide its reasonable sustenance and development plus a reasonable profit for the investors in the complainant corporation or that reasonable profits are not now accruing to complainant and its surplus not now being constantly increased. The Administrator set forth fully the basis and amount of adjustment made by him for increased investment and the balance sheet of December 31, 1943 and that of March 31, 1944 included as an asset $251,046 for cost of equipment.

■ Complainant contends that the Administrator refused to give consideration to a finding of the Army Air Corps that the increased rates should be approved and "were deemed satisfactory to facilitate the prosecution of the war" or to the action of the Interstate Commerce Commission in permitting complainant to file as its minimum reasonable rates, the amended rates without the ordinary statutory notice, thereby implying, as complainant insists, that the Commission had found good cause to permit the change in rates on less than statutory notice. Complainant does not claim that the action of either the Air Corps or the Commission had the decisive effect of fixing its increased rates but insists that the Administrator arbitrarily failed to give any consideration to these facts which, complainant says, made a prima facie case in its behalf. However, the record discloses that the Administrator took cognizance of and considered each of these facts. In his original opinion he commented that the rates had been agreed to by Ford, had been filed with the Commission and approved by the Air Corps. In his opinion upon reconsideration, he remarked that willingness upon the part of the Air Corps to pay rates higher than those established by the Administrator does not of itself make them legal. Obviously, under the Price Enforcement Act, it is the prerogative of the Office of Price Administration, rather than that of the Air Corps or the Commission, to determine ceiling prices. While the Administrator had in mind that the Air Corps had made the recommendation, he decided from all the evidence upon a hearing conducted for that express purpose that not all of the increase applied for by complainant was essential to protect it or the Government under the various provisions of the Act.

As to the action of the Interstate Commerce Commission he directed attention to the fact that under the Act only the rates of common carriers are excluded from regulation by the Office of Price Administration; that the underlying reason for the exclusion of rates of public utilities and common carriers does not apply to the rates of contract motor carriers; that in dealing with contract carriers, the Commission acts in no way as an inflation control agency; that, as to such carriers, its only obligation is to receive and file the reasonable minimum charges of such carriers and that Congress has required such rates to be lodged with the Commission in order to prevent undue competition. The Commission fixes no ceiling price for contract carriers. It merely impliedly approves a reasonable minimum charge and in so doing, performs none of the functions imposed upon the Office of Price Administration and involved in the latter's determination of what ceiling prices should be.

It seems obvious from the record, therefore, that the Administrator did consider the fact that the Air Corps and the Commission, in performing their several functions, had indicated, impliedly at least, that the rates applied for were reasonable, but he concluded, we think rightfully, that under the express mandate of Congress under the Emergency Price Control Act, 50 U.S.C.A.Appendix § 901 et seq., the action of neither of those bodies can be the determinative factor when, in a hearing of evidence submitted for that express purpose he enters upon the determination of what is a valid ceiling price. The record clearly reflects consideration by the Administrator of all documentary evidence submitted and of what each the Air Corps and the Commission had done and a determination upon his part from all the evidence as to what were fair ceilings. The final adjudication was within his functions alone and was not to be surrendered or delegated to other governmental agencies.

■ Complainant complains that it was unfair on the part of the Administrator to compare its prewar carriage with that involved since the outbreak of the war. In the earlier period complainant was a common carrier hauling automobiles. In the latter it was a contract carrier hauling airplanes and parts. There is nothing in the evidence to indicate that there was such a change in the form of complainant's business as to justify disregard of its peace-

time experience. True, the present transportation is carried on in specially built Government-owned equipment and in the earlier operation complainant used its own equipment. But, in their essence, each operation was motor carriage; in each instance complainant was hauling by motor truck heavy loads of material; in each instance it was making long hauls of trailer loads. We think there is no such dissimilarity in the two types of service as to invalidate the Administrator's consideration of complainant's prewar record in the determination of what the present rates should be.

■ Complainant points to the fact that its carriage by truck saved the Government a great sum of money which it insists would otherwise have been necessarily expended for rail transportation. But there is no evidence that if complainant had not carried the goods, it would have been necessary to employ rail transportation. The Government itself purchased and owned the equipment, and we have nothing to show that parties, private or public, other than complainant could not have performed the service. Moreover, comparative costs of different methods of transportation do not furnish the test as to whether complainant is entitled to an increase in rates. Complainant can justify such an increase only upon a showing that the present rates

constitute a threat to continued performance of the service it has contracted to perform.

■ We think that there was nothing arbitrary or capricious in the conclusion of the Administrator that the adjustment should continue only to May 31, 1944. The Administrator wisely concluded, we believe, that he should determine at that time whether, in the light of experience, the continued supply of the services in question was still free of threat of interruption.

■ In view of the fact that complainant's contention that the order contravened section 2(h) of the Act, 50 U.S.C.A. Appendix § 902(h), was not raised in the protest or in reconsideration, it comes too late in this court. However, it is apparent that the Administrator's action did not interfere with any business practices, cost practices or methods or means or aids to distribution, established in any industry. Philadelphia Coke Co. et al. v. Bowles, 139 F.2d 349; Seaboard Oil Co. of Delaware et al. v. Bowles, Em.App., 149 F.2d 661.

Complainant has presented certain other contentions, subsidiary in character, which we have given consideration and find wholly insufficient to invalidate the order. Hence we do not think it necessary to extend this opinion by further discussion.

Judgment will enter dismissing the complaint.